ELLIS, Judge.
This is a suit for compensation in which the plaintiff prays for permanent and total disability and hence for $30 per week commencing July 17, 1949 together with 5% per annum interest on each and every installment from its respective maturity date until paid, payable in 400 weekly installments and for the further sum of $50 medical expenses and all costs.
Plaintiff alleged that he was employed by the O. W. Dyer Drilling Company in the capacity of a “clean-up” man, which duties required him to clean the derrick, floors and quarters, scraping and painting the rig, heavy manual labor involving moving and handling heavy equipment, handling and moving drilling pipe and other duties which are commonly known as “rough neck” work in oil fields; that on the 10th of July, 1949, while so employed he was assigned by the drilling foreman of the Dyer Drilling Company the duty of emptying a reserve tank of drilling mud located on the drilling barge; that in order to{ empty this tank it was necessary to unbolt a plate covering an opening in said tank, but that plaintiff could not get to all the bolts unless and until he moved two drums of caustic soda resting against the plate; that these drums weighed about 100 pounds each, and while attempting to move one of the drums by partially lifting it he suffered a severe injury to his back which caused a very sharp pain along the spinal cord and caused him to drop the drum. He alleged that he is totally and permanently disabled as the *175 result of the accident and injury to his back and sues his employer and its insurer.
The defendants answered by way of a general denial of the material allegations of the petition and alleged that the only compensation plaintiff is entitled to is $21.45 which was tendered to him for the time from the date of his injury until his return to his employment.
The case was tried and judgment rendered with written reasons in favor of the plaintiff, awarding compensation for 400 weeks at $30 per week commencing July 17, 1949 together with the usual 5% per annum interest and all costs.
From this judgment the defendant has appealed.
The facts reveal that the plaintiff while employed as a "clean-up” man by the O. W. Dyer Drilling Company on July 10, 1949 was ordered by the Dyer foreman to empty a reserve tank of drilling mud located on the drilling barge, and in order to carry out this assignment it was necessary for him to unbolt a plate covering an opening in the tank, and as there were two drums of caustic soda weighing about 100 pounds each resting against this plate it was necessary for plaintiff to move the drums, and in so doing he slipped as a result of an unlocked hatch which caused him to fall and injure his back. Plaintiff states that he became sick at his stomach and he was taken to Leesville by his brother and he afterward went to the home of a relative of his wife and went to bed. His wife called Dr. Ford who was the company doctor and whom he testified treated him. Dr. Ford did not testify in the case so what treatment was given is not clear except that plaintiff said he prescribed hot baths and rubbing.
Plaintiff returned to work for the defendant on July 23, 1949 with the understanding that he would be assigned to light work only. Apparently this was all that he did until he was discharged about August 1, 1949, in order that the tool pusher’s brother, who according to the plaintiff had more seniority than he did, could take- his job. Plaintiff frankly stated that the tool pusher’s brother deserved the job and “they had to let me go.”
During the time plaintiff worked for the defendant after his injury for approximately seven days, he worked eight hours a day and painted the top of an oil tank and also did scraping. However, he testified that he was unable to do some of the other duties that he had done before. Plaintiff thereafter attempted to get work with other oil companies, the names and number not being shown, but stated that the only job open was rough-neck work and that he could not do “rough-neck”, so on October 12, 1949 plaintiff enrolled in the barber school in New Orleans under the G. I. Bill of Rights. He stated that he did not want to be a barber but he was entitled to the benefits and decided to study barbering. He finished about July, 1950. This course required, as is generally known, standing and cutting-hair and shaving people.
Plaintiff’s wife was very ill with cancer about this time and it was necessary that he be in constant attendance at the hospital with her until she died on August 23, 1950. After the death of his wife, along in September 1950 he tried to go into the barber shop business but he couldn’t get a job and had no money to build.a shop.
In October 1950 plaintiff secured a job with the Latex Gulf Oil Company and was given a pre-employment physical examination on October 7, 1950, by Dr. Gravois. Plaintiff was given the O.K. to work by Dr. Gravois and stated that his duties consisted of burning trash, and cleaning up, painting tanks, doping small connections, presumably pipe connections, taking care of the tool shed, tool house and keeping it clean, and that he was classed as a roustabout. He was first paid $1.25 an hour and before he was laid off he was receiving $1.40 per hour. This term of employment lasted approximately two weeks and plaintiff was again laid off, however there was no contention that his dischargé was due to any inability to perform the work because of his allegedly injured back.
There is nothing in the record to show what plaintiff did from the time he was *176 discharged on this job until he went to work again in January 1951 for the same company, Latex Gulf Oil Company, and for whom he was still working at the date of the trial. He described his duties as “derrick man” and “pumper”. His wages were $1.48 per hour for 48 hours a week which is six eight hour days.
Introduced in evidence are the number of hours worked by plaintiff for Latex Gulf Oil Company from February 1951 until April 1952 which shows 2907 hours and his earnings were $4289.33 during this time. His earnings included a $50 Christmas bonus. From this document it will be noted that plaintiff lost very little time and there is no contention or intimation that he lost any time on account of his back. In fact, there is no testimony or explanation offered or sought in the testimony as to why, for example, he worked 166 hours in February and 204 hours in March.
There is no doubt but that plaintiff did suffer an accident and injury on July 10, 1949 as described while working for the defendant oil company, however, the entire question is the extent of the plaintiff’s disability as the result of the accident and injury. Plaintiff contends that he is totally and permanently disabled because he cannot do the same heavy work he claimed he was doing at the time of his injury. Specifically it is plaintiff’s contention that as a result of the accident and injury to his spine he suffered a ruptured disc, and although subsequent to the accident and on the date of the trial he was engaged as a “clean-up” man, “derrick man” and “pumper”, in the oil industry which were similar to some of his former tasks, but they do not substantially constitute employment similar to that performed for defendant since his present physical ability to perform skilled, semiskilled and common labor is limited to that work not requiring lifting, carrying and moving of heavy objects. In order to decide this question presented, it is necessary that we review somewhat in detail plaintiff’s occupation and duties at the time he was injured and thereafter and all the medical testimony in the record.
On the date of plaintiff’s accident he was later seen by Dr. Ford but we have no testimony of this doctor in the record and must depend upon plaintiff’s version of Dr. Ford’s treatment. There is no diagnosis by Dr. Ford. It is plaintiff’s testimony that he was off from work approximately 12 days and when he was asked to return to work by his employer, he told Dr. Ford he wasn’t able to do that work and he states that Dr. Ford told him, “Well, go on back and I’ll give you a note and you will only have to do light work.” During these days there is no testimony by any fellow employee with regard to how he did his work and it must have been satisfactory for he would have still worked there apparently except that a man having seniority was given his job. The plaintiff himself testifies that he saw Dr. Ford frequently during his term of employment and complained of pain in his back. There is nothing in the record to indicate why Dr. Ford was not called to testify.
It appears that at the request of Dr. Sidney Ford, the plaintiff was examined by Dr. J. A. Colclough, a neuro-surgeon and general practitioner of New Orleans. This doctor was called as a witness on behalf of plaintiff and stated to the court that he did not wish to qualify as an expert in the case upon being informed by the court that he had a right to refuse to do so.
Counsel for plaintiff then offered a letter addressed to him dated August 30, 1949 in which this doctor had copied his report to Dr. Ford made on or about August 10, 1949. This was objected to on the ground that the doctor was present and could testify. The Court overruled the objection by ordering counsel for plaintiff to proceed to examine him on the report.
The doctor in his report outlined the plaintiff’s chief complaint as pain in the lower back, right hip, thigh, popliteal space and calf. Under the headin^ of “History” the plaintiff stated that remaining too long in one position causes him to have pain and when driving a car the pain is worse. There was no numbness in either extremity
*177 The plaintiff then described the pain in his back and stated that lying, sitting, standing or walking too long at any time caused him pain. The doctor made a neuro-logical examination and in his opinion found a narrowing of the fifth lumbar intraverte-bral space and diagnosed plaintiff’s trouble as ruptured fifth lumbar intervertebral disc causing sciatica on the right side. Dr. Colclough as a result of his examination and finding, recommended hemilaminectomy and removal of the disc herniation. It was his further opinion that continued rest would bring about a period of remission but he believed that his symptoms would recur as soon as he attempted laborious work again.
On July 3, 1950 which was about five days prior to the date on which plaintiff filed this suit or almost one year from the date of the alleged accident and injury, Dr. Col-clough re-examined plaintiff. In the doctor’s report we find the following:
“Interval History: Mr. Cheramie has not worked since his injury. He gets along very well as long as he is not doing anything. He has been taking a course in barber’s college, since October 1949. He is able to work awhile, and at times is stricken by pain in his lower back, right buttock and hip, and if very tired he gets pain in the right calf and posterior portion of the right thigh. There is no numbness of his toes. Coughing and sneezing cause shock-like feeling in his back. The pain in his back is made worse by bending over. At times this worse than at other times. There is no bladder disturbance. He awakens frequently because of back discomfort. Driving a car causes pain as above described.
“Neurological Examination: There is no appreciable disturbance of gait. There is no appreciable loss of lumbar lordosis. , There is very slight thoracic scoliosis with convexity to the left, which represents no abnormality. An-teflexion of the spine permits the finger tips to reach the junction of the middle and lower 3rds of the tibia, causes low back pain at- this point. Dórsiflexidn of the spine is not limited, but is painful at it’s extreme. Laterial flexion is not limited, but to the right, it causes pain in the right ilio-lumbar region. There is no appreciable paravertebral spasm, today. There is pain upon pressure over the 4th and 5th Lumbar inter-spaces, the 5th being greater than the 4th. Pressure over the right 5th lumbar spine causes pain which is referred to the right lower sacrum. The knee and ankle jerks are present, the left ankle jerk being greater than the right. Leg raising on the left is negative, but there is low back pain at 70 degrees from the horizontal. Leg raising on the right causes low back pain at 70 degrees, and foot dorsiflexion causes pain in the right sciatic distribution. Perception of light touch on the right is impaired over the 1st and 5th toes, the 5th being more impaired than the 1st. There is diminished perception of pinprick over the right 5th and 1st toes, with much greater impairment over the 5th than the 1st toe. Proprioception and vibratory perception are unimpaired. Babinski is bilaterially negative. The abdominal reflexes are normal. No clonus'is present. Resistance to passive motion is not increased upon flexion of the extended lower extremity at a point where low back pain is caused. No relief is obtained upon flexion of the leg upon the thigh.
“Diagnosis: Herniation of the 5th Lumbar Intervertebral disc causing sciatica on the right side.
“Conclusion: There is less evidence of intervertebral disc herniation at this time than there was in August 1949. However, this patient has not been doing laborious work for a period of 10 months or more, and I believe that" presently he is in a period of remission with abatement of symptoms. In order to make a definitely positive diagnosis in this case, hospitalization and complete investigation is recommended.”
If we take as true the “Interval History” which this plaintiff gave to Dr. Colclough on *178 July 3, 1950, he cannot have suffered the entire time he was taking the barber course in New Orleans, yet there is not one witness nor any mention by him of suffering any pain during that time. It is our understanding that a ruptured disc such as plaintiff claims he has is most painful and yet we find no testimony in this record except that of plaintiff and one fellow worker who testified that plaintiff told him in going to and from work that his back hurt him while driving, and yet it is plaintiff’s contention that he has had a ruptured disc from July 10, 1949 to the date of the trial on May 12, 1952.
Dr. John Gravois testified on behalf of the defendant with regard to his examination of the plaintiff on two occasions, October 7, 1950 and February 29, 1952. With regard to the first examination the doctor stated that he had known the plaintiff all his life, that he did not give him as thorough an examination possibly as he should but that plaintiff walked into his office apparently in good physical condition but made no attempt “to bring out any points as to the back injury he had had in the past.” On this examination the plaintiff made no mention of having had any back injury, nor did he tell the doctor that he was unable to do hard, laborious work, and the doctor did not limit plaintiff to any particular work. As stated by the doctor, “I had no restriction.”
As to the second examination the doctor testified that it was made for the account of the Humble Oil Company to whom plaintiff had applied for work. As to this examination the doctor testified:
“At this sitting the boy passed a complete physical examination. He brought out the fact that he had injured his back some time in the past. As to my recollection, I made a notation on this physical examination to Humble Oil Company that the man had had an old injury of his back. He complained of no trouble as far as I was concerned, so I passed him to go to work for Humble. I didn’t know he hadn’t gone to work for Humble. I thought he was. I just found out recently he hadn’t accepted the position. Why, I don’t know.”
On this examination the plaintiff told Dr. Gravois that he was then working for Latex Gulf Oil Company and he thought that this employment had continued from his first examination, however, the record shows that the plaintiff only worked approximately two weeks after the examination and his reemployment with this company was in January 1951. It is clear that the plaintiff told this doctor about his back injury on July 10, 1949 and it is equally clear from the testimony that the doctor did not restrict plaintiff as a result of his examination in his work nor did plaintiff give the doctor any idea that he thought himself that he should be restricted to light work. He made no complaint of any trouble to this doctor.
The plaintiff under cross examination attempts to testify as to what a clean-up man does, and a roustabout and a roughneck. The only distinction is that he testified that doing work as a rough-neck was harder than the duties of a clean-up man or a roustabout. Plaintiff’s main contention seems to be that he can’t lift heavy objects, however, there is nothing in the record to show that he ever lifted anything other than this one drum, and due to the covering of a hole in the barge not being latched it tipped with him and he slipped and fell with the 100-pound drum of caustic soda.
The defendant has offered the testimony of Dallas Smith who was the superintendent of production of the Latex Gulf Oil Company during some of the time that plaintiff was employed by them. He stated that he had known the plaintiff 12 years and that he had hired the plaintiff the first time he worked for the company which lasted approximately two weeks, and that he had had him examined medically by Dr. Gravois. It was his intention to make a gang-pusher out of the plaintiff but he made a clean-up man out of him instead. In this job plaintiff cleaned up around the property, as the witness stated it was “pretty dirty. Lots of stuff needed to be picked up and burned. *179 Painting to be done. He did that work.” The plaintiff, in addition to picking up and burning trash, painted and doped lines and connections, which consisted of work on the broken connections in the shed. According to this witness plaintiff did all the work that he was required to do in an ordinary manner as he saw him each day, and he was not fired for any incompetency. This witness was also with the Latex Gulf Oil Company when the plaintiff returned to work in February 1951 and he observed him up until October 1951. He saw the plaintiff each day and he was performing the work of a derrick man. Pie described these duties as follows:
“It was workover work. Not drilling, and they were using tubing instead of drill pipe. He was working up on the derrick when going in and out of the hole and would unlatch the elevator when coming out of the hole and set the pipe back out the way. Going in the hole, he would latch the elevator, put pipe out and latch the elevator on it.”
The plaintiff also at times climbed the derrick when he couldn’t get a ride on the block. This witness testified that there was nothing much a derrick man could do without doing some stooping and it required the full use of both hands and legs as well as a sound back, as he put it when asked if a man with a lame back could do the work: “It could be done. I would rather not do it.” During the time that this witness was superintendent until October 1951 the plaintiff never complained of his back to him nor did he notice that he ever stopped to rest from work during the day.
On cross-examination he stated that plaintiff never did any heavy lifting during the two weeks period. This witness frankly stated that the clean-up work plaintiff did for Latex Gulf Oil Company during his first employment was not the same clean up job he was on for the defendant when he was injured but as he put it, “two different jobs altogether.” He stated that it was not the same strenuous work that was done for the defendant. He did classify the work done for the defendant as well as that done for the Latex Gulf Oil Company from February to October by plaintiff as laborious, in other words, the men that perform that kind of work are laborers.
The defendant called Gene Hochendel, who had been the superintendent for Latex Gulf Oil Company from August 1951, as a witness who testified that he had been with the company during all of plaintiff’s employment, that he had never complained of any pain in his back nor did he have to lay off to rest; that the plaintiff worked steadily eight hours each day for five or six days depending on their work schedule, and that he performed duties as the other men did. That his work was satisfactory and that at the time of the trial plaintiff was earning $1.48 per hour. He described plaintiff’s job as being “officially titled derrickman oti a small workover rig, a company pulling unit.” His duties consisted of taking care of the mud pump by making the necessary repairs and operating it and also working-in the derrick when necessary. He described his other duties as being manifold, “normal maintenance and lease work which the rest of the crew engages in at the same time.” He described normal lease work as keeping the lease clean, keeping the lines cleaned and doped which is necessary for the flow lines which lay out across the marsh were susceptible to corrosion. In doping these pipes or lines it was necessary for the plaintiff to scrape them with a small metal object somewhat like a knife and then to apply the liquid which stopped the corrosion. Plaintiff was also required to work on the floor of the derrick, that is, the base. The witness described these duties as follows :
“These wells when they are pulled and put on production must be connected up. They must be hooked up and unhooked and during the course of that time he has to work along with the rest of the crew. It isn’t in the derrick. It’s on the ground. Doing manifold duties of connection work. Making fittings together, building lines, laying lines, duties connected with connecting the wells and putting them in the tank.”
*180 This witness classed the plaintiff’s work as being hard. The plaintiff was also required to once a week relieve the pumper, which was considered light work. On the ground the plaintiff was also required to operate the pulling machine which is described as a winch used to hoist the pipe. On the front is a drum which reels the cable up and on the rear is a set of controls and a seat comparable to a tractor. The operator sits on the seat and worked a number of levers controlling the hoisting operation and it is comparable to a drill on a large rig. This takes some force to move or pull these levers. This witness stated that there was a ladder on the derrick which the plaintiff would climb and he would say “normally if the rig is working steadily, he will climb once to twice a day and ride the elevators enough to get him back down three or four times.” The plaintiff’s station to where he had to climb was 55 feet. This witness described the plaintiff’s duties on the derrick as follows:
“A. He puts on a safety belt immediately and if the pipe is going to be tripped, that is, up or down, he begins his normal work which has been described numerous times. He latches or unlatches the elevator as the case may be and either racks the pipe or rem’oves it from the racks as the case may be.
“Q. Is that pipe hanging or suspended? A. No. Standing on the derrick floor leaning against the board.
A slight lean.
“Q. Do I understand Linwood Cher-amie would push it into position or place. A. That is correct.
“Q. Using his hands ? A. Yes, sir.
“Q. While standing on the board?
A. Yes, sir. That’s correct.
“Q. What other manual labor with his hands did he do in that position?
A. He holds the pipe which is being made up on the floor to keep it from wobbling.
“Q. That requires both hands? A. One hand.
“Q. In what position is he when he does that, standing straight up, squatting down, leaning over? A. Standing. As well as the safety belt, he is provided with a rope which helps in his work. He can hold to the rope. Similar to a guide rail on the stairs. He would normally have one hand on that rope, as the climb stairs, and the other hand on the pipe.”
In addition to the above duties this witness testified under cross examination that the plaintiff also helped in connecting up wells which occurred about once a month. In order to connect up a well with the pipe work involved if the well has previously been on production, it took about two hours; if not previously on production, approximately six hours and four men did the work. As to the details of the work the witness gave the following testimony:
“Q. Then in connecting up a well, Linwood Cheramie works with three other men together for a period of time of either two hours or six hours, depending upon the well to be connected and this work is done only about once a month, is that correct? A. No, I can’t call that correct because it is not done only once a month. It can be done every two or three days. If we are recompleting a well and the completion is no good, the well may be pulled two or three times and reconnected. That will be done two hours work every two or three days for three times running. Normally he works with three other men doing the necessary work on the floor such as connecting up wells. :
“Q. . In making up pipe to connect the well, does Linwood Cheramie necessarily have to stoop over and lift?
A. Yes, he would have to stoop, in his work. He can’t work standing up. Practically anything you handle is lying on the ground. If it is a connection you have to bend over to pick it up.
“Q. Would Linwood necessarily have to stoop or could one or all three of the other men do the stooping and *181 lifting? A. They could. I wouldn’t argue. As long as it all got put together I wouldn’t argue about it.
“Q. You don’t know really whether Linwood Cheramie does the stooping or the other three men do it? A. I imagine he does his share. I don’t hear any complaints.”
It was shown that this company had tank batteries on its lease which were approximately 16 feet high and in order to reach the top of these tanks the plaintiff went up steel steps with rails on the side.
On rebuttal the plaintiff offered the testimony of a witness who was replaced as derrick man by the plaintiff and he testified that sometimes the plaintiff climbed the ladder but most of the time he rode the block and that when he was derrick man he climbed it “pretty fast”, whereas he had seen “Linwood stop on his way up there to rest.” This witness further testified that nobody working for Latex did any heavy work, it was all light stuff, “not like a big drilling rig.” This is the witness who testified that he had heard the plaintiff complain about his back but not while he was working but while riding in his car the plaintiff “complained about his back hurting.”
We have reviewed Dr. Colclough’s reports, and in his testimony bn behalf of the plaintiff he reaffirmed that which he had stated in the reports, although he refused to testify as an expert in the case. This doctor’s testimony on cross examination is in our opinion very important to this case and we will therefore quote some of it as follows:
“Q. Had Mr. Cheramie told you at that time that he had worked on an oil derrick doing a cleanup man’s work or picking up and painting ten days during July, 1949, would that have changed your final diagnosis? A. No, sir, I don’t think it would have necessarily.
“Q. Did he tell you that he had worked ? A. I don’t think he did.
“Q. Now, Doctor, when you examined Mr. Cheramie in September, 1951 and made the memorandum that we referred to a few minutes ago, did Mr. Cheramie tell, you that he had performed work as a derrickman or merely as a pumper? A. That he had been working as a pumper only.
“Q. Doctor, you heard part of Mr. Cheramie’s testimony. Did you listen to it ? A. Parts of it, yes.
“Q. You heard him testify that his duties as a derrickman required him to go on a derrick' from the ground forty or fifty feet, sometimes climbing up the ladder, sometimes rides the rig, what we laymen call it, that he works up there all day long, sometimes going up there two and three times when not working and works on the ground picking up, just general oil field labor work; that he paints tanks, sometimes climbing on top of a sixteen foot tank; that he is quite active and agile since he works high off the ground. Would that have changed your diagnosis had he told you those things? A. I believe it would.
“Q. Did Mr. Cheramie tell you that he worked in the capacity and doing the duties I have just described throughout February . 1951, March, 1951, April, 1951, May 1951, June, 1951, July, 1951, and a period of September, 1951, that expired before you saw him September 24th of that month, full time, eight hours a day, six days a week. Would your diagnosis have been the same ? A. I don’t think it would have.
“Q. Doctor,'have you seen this man, Mr. Cheramie since September 1951? A. I have no record of it but I sort of had the impression that I saw him more recently than that.
“Q. You testified a few minutes ago in answer to Mr. Culligan’s question referring to the case Stanton versus The Texas Company that a patient with a ruptured herniated intervertebral disc, particularly the fifth space, could not do heavy work. You testified to that? A. Yes, sir.
*182 “Q. Do you wish to change your testimony with reference to Mr. Cher-amie? A. No, I do not.
- “Q. Now, doctor, if the record shows that Mr. Cheramie worked since September 24, 1951 for the balance of that month, that he worked all of October, all of November, all of December, all of January, 1952, all of February, 1952, all of March, all of April, and is working now doing the work that you heard him testify yourself that he did and that which I referred to earlier would you now say Mr. Cheramie has a ruptured intervertebral disc in the fifth lumbar interspace ? A. No, sir.”
On cross-examination this doctor testified:
“Q. Doctor, would the fact that this man worked regularly steadily, in a semi-laborious capacity requiring climbing change your opinion ?
“Mr. Culligan:
“I object. First of all, what semi-laborious is is something I don’t think we are called upon to know.
“By Mr. Loeb:
“Q. Doing light work. Light work including climbing and p.ainting tanks; climbing up forty or fifty foot ladders once a day or more frequently; standing on a platform fifty or sixty feet in the air, working with his hands; light work, would that cause you to change your opinion? Remember in asking that question where the patient had been doing this work eight hours a day, six days a week for over sixteen months. A. I don’t see how he could climb a forty or fifty foot ladder and be suffering from intervertebral disc herniation.”
In view of the fact that the hypothetical questions asked Dr. Colclough contain essentially the true facts as shown by this record, and his answers were that under those facts he does not think he would have made the diagnosis of a ruptured disc and that that would have changed his diagnosis had he known, and that under those facts he would not now say that plaintiff had a ruptured intervertebral disc in the fifth lumbar interspace, we are of the opinion that his former diagnosis amounts to nothing, as being based entirely upon what the plaintiff told him, and was of no import under the facts as shown on the trial of the case. Under the facts proven this plaintiff is doing substantially the same work for Latex Gulf Oil Company as he was for the defendant on July 10, 1949 when he was injured. The plaintiff has failed to prove any injury other than from July 10, 1949 to approximately August 1, 1949 when he was discharged. Plaintiff failed to produce any fellow employee who could testify that he showed any signs or evidence of pain from July 23, 1949, when he returned to work until the date of the trial, but even on the trial as a witness in his own behalf the plaintiff did not testify to any pain while performing his various duties as clean-up man, derrick man, pumper or roustabout. 'He apparently was intent on making the point of not having ever done any heavy lifting, so as to distinguish his present duties from those he was performing at the time of his injury.
Defendant admitted that plaintiff was entitled to $21.45 which amount was tendered to him and refused.
It is ordered that defendant pay the plaintiff said sum and it is further ordered, adjudged and decreed that the judgment of the District Court be and the same is hereby reversed and the plaintiff’s suit dismissed at his cost.
Rehearing denied.
TATE, J., recused.
CAVANAUGH, Judge ad hoc by appointment.